# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BRITTANY MACDONALD**, | Case No. 3:22-cv-01942-IM |
| Plaintiff, | **OPINION AND ORDER GRANTING DEFENDANT OHSU'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **OREGON HEALTH & SCIENCE UNIVERSITY**, a Public Corporation and Governmental Entity, | |
| Defendant. | |

Ray D. Hacke, Pacific Justice Institute, 317 Court St. NE, Suite 202, Salem, OR 97301. Attorney for Plaintiff.

Brenda K. Baumgart, Rachelle Collins, Alex Van Rysselberghe, and Thomas R. Johnson, Stoel Rives LLP, 706 SW Ninth Ave., Suite 3000, Portland, OR 97205. Attorneys for Defendant.

**IMMERGUT, District Judge.**

Defendant Oregon Health and Science University ("OHSU") moves for summary judgment against Plaintiff Brittany MacDonald's remaining Title VII claim for failure to accommodate her religious beliefs. Motion for Summary Judgment ("MSJ"), ECF 55. Plaintiff worked as a registered nurse in the Mother Baby Unit ("MBU") at Doernbecher Children's

PAGE 1 – OPINION AND ORDER GRANTING DEFENDANT OHSU'S MOTION FOR SUMMARY JUDGMENT

Hospital, and she sought an exemption from Defendant's mandatory COVID-19 vaccination policy on religious grounds. Defendant denied Plaintiff's exemption request and later terminated her employment. Defendant previously conceded that Plaintiff established a prima facie claim for discrimination under Title VII, and Defendant does not challenge her ability to make out a prima facie case for this Motion. *See* MSJ, ECF 55 at 18 n.5. Defendant argues that there are no genuine disputes of material fact as to whether allowing Plaintiff to remain unvaccinated would pose an undue hardship to Defendant. This Court heard oral argument on Defendant's Motion on July 1, 2024. ECF 72. Based on the pleadings, oral argument, and record of this case, this Court GRANTS Defendant's Motion because Defendant is entitled to judgment as a matter of law on its affirmative defense of undue hardship. As explained below, the analysis of undue hardship requires an examination of both economic and non-economic costs to an employer's business, based on the information available to the employer at the time it made its undue hardship decision.

## LEGAL STANDARDS

Summary judgment may be granted in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party will have the burden of proof on an issue at trial, such as a defendant on an affirmative defense, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (per curiam) (noting that a party moving for summary judgment on a claim for which it will have the burden at trial "must establish beyond controversy every essential element" of the claim (internal quotation marks omitted)).

PAGE 2 – OPINION AND ORDER GRANTING DEFENDANT OHSU'S MOTION FOR SUMMARY JUDGMENT

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). A court may, in its discretion, consider the admissibility of evidence offered at summary judgment even when no objection is made. *See Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016). "Authentication is a 'condition precedent to admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Orr*, 285 F.3d at 773 (footnotes omitted). "[U]nauthenticated documents cannot be considered in a motion for summary judgment." *Id.* (collecting cases). "[D]ocuments authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of [Rule] 56[(c)(4)] and the affiant must be a person through whom the exhibits could be admitted into evidence.'" *Id.* at 773–74 (footnotes omitted). Similarly, "[b]ecause summary judgment qualifies as a substitute for a trial, and hearsay (absent an exception or exclusion) is inadmissible at trial, a motion for summary judgment may not be supported by hearsay. Courts have likewise held that papers opposing a motion for summary judgment may also not be supported by hearsay." *Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1157 (S.D. Cal. 2022) (citations and emphasis omitted).

## BACKGROUND

### A. Undisputed Facts

Defendant OHSU is the largest public hospital system in Oregon and the "only public academic health institution." Declaration of Dr. Renee Edwards ("Edwards Decl."), ECF 57 ¶ 6. It operates hospitals and clinics across Oregon and southwest Washington. *Id.*

Plaintiff worked as a registered nurse in the Doernbecher Children's Hospital MBU in 2021. Complaint ("Compl."), ECF 1 ¶ 18. The MBU provides intensive care services for recently

pregnant mothers, newborns, and a small number of other adult patients with special conditions. Declaration of Nurse Molly Blaser ("Blaser Decl."), ECF 59 ¶¶ 7–9.

In the late months of 2019, SARS-CoV-2, the virus that causes COVID-19, was first reported in China. Expert Report of Dr. Seth Cohen ("Cohen Rep."), ECF 61-1 ¶ 15. Over the following months the virus spread "explosive[ly]" "around the globe." *Id.* By March 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a pandemic. *Id.* It is undisputed here that COVID-19 caused a deadly global pandemic. At its first peak at the end of 2020 and into the beginning of 2021, over 4,000 Americans were dying per day from COVID-19. *Id.* ¶ 29.

When the COVID-19 pandemic began, Defendant tracked the spread of the virus through its facilities and implemented policies based on science and guidance issued by the Centers for Disease Control and Prevention ("CDC"), the Centers for Medicare and Medicaid Services ("CMS"), the U.S. Food and Drug Administration ("FDA"), and the WHO. Declaration of Dr. Marcel Curlin ("Curlin Decl."), ECF 58 ¶¶ 19–20. Defendant adopted policies relating to personal protective equipment ("PPE"), social distancing, testing, environmental measures, and education. *Id.* ¶ 22.

Between June and September 2021, during the proliferation of the Delta variant, COVID-19 cases rose by 1,200%, with hospital admissions up by 600% nationwide and, near the peak of the Delta surge, a daily death toll of 1,500 Americans. Cohen Rep., ECF 61-1 ¶ 29. "By December 15, 2021, [one] out of every 100 persons in the [United States] above the age of 65 had died from COVID-19." *Id.* At that time, the United States death toll measured from the beginning of the pandemic exceeded 800,000. *Id.* The risk of Delta transmission was especially high in hospitals, where healthcare workers and patients were often unable to socially distance.

Curlin Decl., ECF 58 ¶ 15; Cohen Rep., ECF 61-1 ¶¶ 34–35. At that time, "organizations like the CDC, CMS, FDA, and WHO recommended vaccination as the best way to protect against COVID-19." Edwards Decl., ECF 57 ¶ 27; *see also* Cohen Rep., ECF 61-1 ¶ 28.

During the Delta surge, in the fall of 2021, Defendant implemented its COVID-19 Immunizations and Education Policy ("Policy"). Edwards Decl., ECF 57 ¶ 28. This Policy aligned with guidance from the CDC, WHO, FDA, and CMS that vaccination was "the best way to protect against COVID-19" at that time. *Id.* ¶ 27; Curlin Decl., ECF 58 ¶ 20. The Policy required all of Defendant's personnel to become fully vaccinated against COVID-19 by October 18, 2021, unless they had an approved medical or religious exemption. Edwards Decl., ECF 57 ¶¶ 28–29. All requests for religious exceptions were sent to the Vaccine Exception Review Committee ("VERC") for evaluation and decision. *Id.* ¶ 29.

In September 2021, Plaintiff submitted a religious exception request to Defendant's Policy. Compl., ECF 1 ¶ 21. Defendant determined that Plaintiff did not qualify for a religious exception and denied her request. *Id.* ¶ 24. Plaintiff did not thereafter receive the vaccine, and Defendant terminated her employment in December 2021. *Id.* ¶ 31.

## B.  Evidentiary Issues

Before addressing the substance of Defendant's motion, it is necessary to address various evidentiary issues raised by materials offered in support of Plaintiff's response. "When a party opposing summary judgment fails to comply with the formalities of Rule 56, a court may choose to be somewhat lenient in the exercise of its discretion to deal with the deficiency," but "discretionary leniency does not stretch so far that Rule 56[(c)] becomes meaningless." *Sch. Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993). In opposing summary judgment, Plaintiff provides her own Declaration with attached exhibits, Declaration of

Brittany MacDonald ("MacDonald Decl."), ECF 66, as well as an exhibit attached to the Declaration of her counsel, Declaration of Attorney Ray D. Hacke ("Hacke Decl."), ECF 67. As explained below, considering some of these exhibits for purposes of this Motion would stretch Rule 56 too far.

Plaintiff attaches to her Declaration as Exhibit E, a February 2021 report from the European Medicines Agency, which, according to Plaintiff, states that "the vaccine was not proven to prevent transmission." MacDonald Decl., ECF 66 ¶ 18; *see id.*, Ex. E. Plaintiff attests in her Declaration that Exhibit E is a true and correct copy of the report. *Id.* Plaintiff describes no personal knowledge of the report, nor does she describe any other manner in which she is competent to testify about its contents. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Moreover, even if this Court were satisfied that the report is what Plaintiff claims, the report is nonetheless hearsay and Plaintiff has not set forth any evidence that it falls within a recognized exception to the rule against hearsay. *See Orr*, 285 F.3d at 779. As for the other exhibits attached to Plaintiff's Declaration, this Court will exercise its discretion to consider them, despite any deficiencies in their form.

Along with the exhibits attached to her Declaration, Plaintiff also introduces evidence in the body of her Response by providing hyperlinks to studies, reports, and articles. Plaintiff does not explain why these pieces of evidence are provided in this form rather than attached to a declaration as with her other exhibits. For the following reasons, this Court declines to consider several of these cited publications for purposes of summary judgment.

Plaintiff cites an August 2021 article from National Geographic, which she offers to prove that there were "multiple peer-reviewed studies published at or near the time the [Oregon Health Administration] issued its Vaccine Mandate show[ing] that COVID-19 vaccines did not prevent the contraction or transmission [of] COVID-19." Plaintiff's Response ("Pl.'s Resp."), ECF 65 at 14. She claims that "[g]iven COVID-19 vaccines' ineffectiveness against the Delta variant, a reasonable juror could find OHSU's assertions of its need to protect the public pretextual." *Id.* "It is axiomatic to state that newspaper articles are by their very nature hearsay evidence and are thus inadmissible if offered to prove the truth of the matter asserted . . . ." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, No. CIV 87-987 PHX RCB, 1990 WL 126500, at *3 (D. Ariz. July 25, 1990). Plaintiff relies on this article for its truth—that COVID-19 vaccines were ineffective, particularly against the Delta variant. Because Plaintiff offers this article for a hearsay purpose, she must show that it falls within a hearsay exception or that the statements could be made admissible at trial through a different form. Plaintiff has not done so. This Court will not consider this article for purposes of summary judgment.

Plaintiff cites a December 2020 study purportedly conducted by Pfizer and BioNTech which she claims "showed that more people who took COVID-19 vaccines contracted COVID-19 than unvaccinated persons who were given a placebo." Pl.'s Resp., ECF 65 at 16. The hyperlink she provides leads to a March 2022 BioNTech report to the Securities and Exchange Commission. *See id.* at 16 n.9. Plaintiff bears the burden of assisting this Court in understanding the facts, and this Court will not go searching for miscited reports. Further, assuming that the study stands for the proposition Plaintiff claims, the inferences Plaintiff wishes this Court to draw are the subject of expert testimony, and Plaintiff has not demonstrated that she is qualified

to give such testimony. This Court will not consider this study for purposes of summary judgment.

Similarly, Plaintiff cites an article from Reason.com from August 2021 for the proposition that, "at the time the [Oregon Health Administration] issued its Vaccine Mandate, COVID-19 had a survival rate exceeding 99 percent." Pl.'s Resp., ECF 65 at 16. The hyperlink that Plaintiff provides appears to lead to a different study cited by Plaintiff elsewhere in her Response, though this hyperlink is broken and this Court cannot confirm where it leads. Again, this Court will not go searching for the correct article. Further, assuming that the article stands for the proposition Plaintiff claims, the inferences Plaintiff wishes this Court to draw are the subject of expert testimony, and Plaintiff has not demonstrated that she is qualified to give such testimony. This Court will not consider this article for purposes of summary judgment.

Plaintiff cites a report provided by BioNTech to the U.S. Securities and Exchange Commission in March 2022. Pl.'s Resp., ECF 65 at 15. She states that, in this report, BioNTech "admitted it lacked proof of its vaccine's safety or efficacy." *Id.* The hyperlink Plaintiff has provided leads to a 700-page report. Nowhere in her briefing does Plaintiff provide a pin cite or a quotation to assist this Court in confirming that this document stands for what she claims it does. It is not this Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins.,* 55 F.3d 247, 251 (7th Cir. 1995)); *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) ("The district judge is not required to comb the record to find some reason to deny a motion for summary judgment."). Because Plaintiff has not aided this Court in determining whether this 700-page report raises a genuine issue for trial, this Court will not consider it for purposes of summary judgment. *See* Defendant's Reply, ECF 68 at 10 n.3 (explaining that Plaintiff "fails to

PAGE 8 – OPINION AND ORDER GRANTING DEFENDANT OHSU'S MOTION FOR SUMMARY JUDGMENT

correctly cite any page within the 700-page document that actually contains the statements alleged").

Plaintiff points to an academic analysis released in November 2021 for the proposition that "[m]any studies, in fact, showed that COVID-19 vaccines exhibited negative efficacy, meaning individuals who took them became more susceptible to contracting COVID-19." Pl.'s Resp., ECF 65 at 15 (emphasis omitted). The hyperlink provided by Plaintiff leads to an error page. Even if the hyperlink were to take this Court to the analysis, titled *Worldwide Bayesian Causal Impact Analysis of Vaccine Administration on Deaths and Cases Associated With COVID-19: A BigData Analysis of 145 Countries*, and the study stated explicitly what Plaintiff asserts, the report itself appears to be hearsay and establishing its reliability would require expert testimony, which Plaintiff does not present. As proffered by Plaintiff, this material is not admissible at trial. Therefore, this Court will not consider this analysis for purposes of summary judgment.

## DISCUSSION

### A. Clarifying the Issues

Plaintiff makes several arguments that are either redundant or inappropriate at this stage. First, Plaintiff argues that she can make out a prima facie case under Title VII. Pl.'s Resp., ECF 65 at 8–10. Defendant conceded as much when it moved to dismiss, *see* ECF 35 at 7, and does not challenge her "ability to make out a prima facie case" now, *see* MSJ, ECF 55 at 18 n.5. This Court need not address this issue as it is assumed for purposes of this Motion.

Second, Plaintiff argues that there is a disputed fact about whether Defendant acted with discriminatory motives. Pl.'s Resp., ECF 65 at 10–13. Defendant's allegedly discriminatory motives are not material to Plaintiff's Title VII claim for failure to accommodate, and so any

related disputes of fact do not preclude summary judgment here.[1] This Court notes that, though Plaintiff moved to amend her Complaint to include a religious discrimination claim, she withdrew that motion. ECF 51.

Third, Plaintiff, invoking the First Amendment, argues that Defendant's actions do not survive strict scrutiny. Pl.'s Resp., ECF 65 at 22–24. Plaintiff also noticed supplemental authority involving constitutional challenges to COVID-19 vaccine mandates. ECF 71. In her Complaint, Plaintiff brought a First Amendment claim against individual defendants who served on Defendant's Board of Directors or VERC. *See* Compl., ECF 1 ¶¶ 50–58. This Court concluded that those individual defendants were entitled to qualified immunity and granted the motion to dismiss Plaintiff's First Amendment claim. *See* ECF 35 at 18–24. Against Defendant OHSU, Plaintiff alleged only a Title VII failure to accommodate claim. *See* Compl., ECF 1 ¶¶ 35–49. Thus, any disputed facts relating to an unalleged First Amendment claim against Defendant OHSU are immaterial to this Motion.[2]

---

[1] At oral argument, Plaintiff suggested that the record is replete with evidence of Defendant's discriminatory animus. When asked for specific citations, Plaintiff pointed to the granting of a religious exemption for a member of the custodial staff who worked in the MBU, but Plaintiff notes that she and this individual "shared similar beliefs." MacDonald Decl., ECF66 ¶ 25. Plaintiff also pointed to Defendant's guidance regarding beliefs it determined did not qualify for a religious exception. *See, e.g.*, *id.*, Ex. F. Neither piece of evidence supports an inference that Plaintiff was subjected to religious animus.

[2] Additionally, as Defendant pointed out at oral argument, Defendant is an arm of the state and is entitled to sovereign immunity under the Eleventh Amendment. *See United States ex rel. Doughty v. Or. Health & Scis. Univ.*, No. 3:13-CV-01306-BR, 2017 WL 1364208, at *3 (D. Or. Apr. 11, 2017) ("Every court that has addressed the issue and conducted an arm-of-the-state analysis has concluded OHSU is an arm of the State of Oregon entitled to Eleventh Amendment immunity.") (collecting cases). Since *Doughty*, the Ninth Circuit has refigured the test for determining whether an entity is an arm of the state. *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1030 (9th Cir. 2023) (en banc), *cert. denied*, 144 S. Ct. 1465 (2024). Under *Kohn*, this Court reaches the same conclusion prior courts uniformly reached: Defendant OHSU is an arm of the State of Oregon. The State of Oregon has not waived its Eleventh Amendment immunity with respect to claims brought under 42 U.S.C. § 1983, as any federal constitutional claim brought by

PAGE 10 – OPINION AND ORDER GRANTING DEFENDANT OHSU'S MOTION FOR SUMMARY JUDGMENT

## B.  Undue Hardship

Because Defendant concedes that Plaintiff made a prima facie case under Title VII, the burden shifts to Defendant to demonstrate that it was unable to reasonably accommodate Plaintiff's needs without undue hardship. The Supreme Court recently clarified the showing a defendant must make to establish undue hardship as an affirmative defense. "[I]n common parlance, a 'hardship' is, at a minimum, 'something hard to bear.'" *Groff v. DeJoy*, 600 U.S. 447, 468–69 (2023). "'Undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Id.* at 468. As described below, undue hardship is properly analyzed by considering both economic and non-economic costs, viewed at the time Defendant decided to deny Plaintiff's requested religious exemption and then terminate her employment for refusing to obtain the COVID-19 vaccine.

### 1.  Analysis of Undue Hardship

#### a.  Economic and Non-Economic Costs

Before *Groff*, federal courts regularly considered both economic and non-economic costs when conducting the undue hardship analysis. *See E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988) (acknowledging that, for an undue hardship analysis, "spiritual costs can exist"); *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009) ("Both economic and non-economic costs can pose an undue hardship upon employers; the latter category includes, for example, violations of the seniority provision of a collective bargaining agreement and the threat of possible criminal sanctions."); *Cloutier v. Costco Wholesale Corp.*,

---

Plaintiff would be. *See Est. of Pond v. Oregon*, 322 F. Supp. 2d 1161, 1165 (D. Or. 2004). And the Supreme Court has held that § 1983 was not intended to abrogate a State's Eleventh Amendment immunity. *See Quern v. Jordan*, 440 U.S. 332, 342–45 (1979). Accordingly, Plaintiff cannot maintain a federal constitutional claim against Defendant.

390 F.3d 126, 134 (1st Cir. 2004) ("Th[e undue hardship] calculus applies both to economic

costs, such as lost business or having to hire additional employees to accommodate a Sabbath

observer, and to non-economic costs, such as compromising the integrity of a seniority

system."); *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious

accommodation that creates a genuine safety or security risk can undoubtedly constitute an

undue hardship for an employer-prison.").

    Indeed, the Third Circuit's decision in *Groff*, which the Supreme Court later vacated,

stated that "[b]oth economic and non-economic costs suffered by the employer can constitute an

undue hardship." *Groff v. DeJoy*, 35 F.4th 162, 174 (3d Cir. 2022), *vacated and remanded*, 600

U.S. 447 (2023). In clarifying the requisite showing for the undue hardship standard, the

Supreme Court in *Groff* did not entirely displace the manner in which the Third Circuit

considered costs. Rather, the *Groff* Court reiterated that courts "must apply the test in a manner

that takes into account *all relevant factors* in the case at hand" and always return to the question

of the "substantial increased costs in relation to the *conduct of [an employer's] particular

business*." 600 U.S. at 470 (emphasis added). The *Groff* Court even noted that "a good deal of

the [Equal Employment Opportunity Commission]'s guidance in this area is sensible and will, in

all likelihood, be unaffected by our clarifying decision today." *Id.* at 471. That guidance directs

employers to consider "not only direct monetary costs but also the burden on the conduct of the

employer's business." *See* MSJ, ECF 55 at 22.

    Following *Groff*, district courts have continued to consider both economic and non-

economic costs when conducting the undue hardship analysis. *See, e.g.*, *Bordeaux v. Lions Gate

Ent., Inc.*, Case No. 2:22-cv-04244-SVW-PLA, 2023 WL 8108655, at *13 (C.D. Cal. Nov. 21,

2023) (considering the safety risk an unvaccinated actor posed to her coworkers for the undue

hardship analysis); *Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 1:19-CV-02462-JMS-KMB, 2024 WL 1885848, at *17–20 (S.D. Ind. Apr. 30, 2024) (considering the cost of a teacher's policy on a public school's "mission to provide adequate public education that is equally open to all").

Consistent with the pre- and post-*Groff* authority, this Court holds that it is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission, in analyzing undue hardship.

### b. Information Available at the Time

Along with considering both economic and non-economic costs when assessing undue hardship, this Court further holds that it is appropriate to confine the analysis to the information available to the employer when it made its undue hardship decision. This approach comports with how courts analyze whether a plaintiff has alleged a prima facie case against an employer— by assessing the information the plaintiff provided to the employer and, thus, the information of which the employer had notice. *See Craven v. Shriners Hosps. for Child.*, No. 3:22-cv-01619-IM, 2024 WL 21557, at *4 n.3 (D. Or. Jan. 2, 2024). "It is axiomatic that an employer can make decisions based only on the information known to it at the time of the decision." *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 888 (7th Cir. 2023), *vacated on denial of reh'g*, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023). Although *Kluge* was vacated and remanded following the Supreme Court's ruling in *Groff*, this Court considers this aspect of the Seventh Circuit's decision to remain applicable and persuasive post-*Groff*.

This approach also comports with common sense. To judge an employer's undue hardship decision based on knowledge and information developed after the fact would hold that employer to an impossible standard. Courts would be tasked with judging an employer's decision

with the benefit of hindsight, irrespective of factors like the consensus of reputable organizations, the evolving nature of a situation, and the type and quality of information available at the time. Title VII does not require employers to predict the future. *See Kluge*, 64 F.4th at 888 ("To suggest that the employer may be held liable for a decision to withdraw an accommodation based on information that did not exist at the time of the decision holds employers to an impossible 'crystal ball' standard."). In determining whether an accommodation would pose an undue hardship, an employer is permitted to draw conclusions based on evidence and information that was available at the time. This Court will limit its analysis accordingly.

### 2.  Defendant Is Entitled to Summary Judgment

Having established the undue hardship analysis, this Court concludes that Defendant is entitled to summary judgment. Considering the costs Defendant would have incurred had it permitted Plaintiff to work as a nurse in the MBU without receiving the COVID-19 vaccine, along with the evidence and information available to Defendant at the time it made its undue hardship decision, Defendant has established that there is no genuine issue of fact precluding summary judgment and it is entitled to judgment in its favor on the affirmative defense of undue hardship.

### a.  Defendant's Evidence

Defendant attaches three Declarations and one expert report to its Motion for Summary Judgment. Edwards Decl., ECF 57; Curlin Decl., ECF 58; Blaser Decl., ECF 59; Cohen Rep., ECF 61-1. Because Defendant bears the ultimate burden on its affirmative defense, it must demonstrate that "the record is so one-sided as to rule out the prospect of the nonmovant prevailing." Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2727.1 (4th ed., updated June

2024). Accordingly, the following discussion walks through the evidence produced by Defendant.

### i.    Declaration of Dr. Edwards

Dr. Renee Edwards is a trained physician who currently serves as the Chief Medical Officer for Defendant. Edwards Decl., ECF 57 ¶¶ 2–5. In 2021, Defendant employed around 20,000 individuals and "cared for roughly 330,000 patients." *Id.* ¶ 6.

As Dr. Edwards explains, Defendant is "publicly created and mandated by the legislature to be a leader in Oregon healthcare and to serve all Oregonians according to [its] public mission and purpose." *Id.* ¶ 8. Its "public policy," or "mission," or "purpose," includes serving the people of Oregon and striving for excellence in education, research, and clinical practice. *Id.* ¶ 9. State law tasks Defendant with "carry[ing] out the[se] public purposes and missions . . . in the manner that . . . best promotes the public welfare of the people of the State of Oregon." *Id.* ¶ 9 (quoting O.R.S. 353.030(4)). Dr. Edwards attests that Defendant "strive[s] to fulfill [its] public mission" as evidenced by its code of conduct and its core values. *Id.* ¶ 10. Defendant also serves Oregon "as a public resource in healthcare, science, medicine, and public health." *Id.* ¶ 11. "Given [Defendant] OHSU's unique role as a mission-based public healthcare provider, [it] has special ethical, professional, moral, legal, and societal responsibilities . . . ." *Id.* ¶ 19.

In fulfilling its mission, Defendant sought not only to provide patients with accessible, exemplary, and safe healthcare, but also to maintain operational capacity and preserve the health and safety of its staff. *Id.* "Data showed that healthcare workers were at significantly higher risk than the general population to be exposed to, and develop, COVID-19. In 2021, thousands of healthcare workers had died from the virus." *Id.* ¶ 22.

In the context of decision-making during the COVID-19 pandemic, Dr. Edwards states that Defendant "followed the most reliable scientific research available" and that "[i]t was the general view of physicians, scientists, and researchers at OHSU (including [her]self) that publicly available resources published by the [CDC, CMS, FDA, WHO], and similar organizations represented the best research on COVID-19 available at the time." *Id.* ¶ 25. Dr. Edwards attests that these organizations relied on "consistently reliable" and "high quality" research, which "bore numerous indicia of reliability." *Id.* ¶ 26.

Dr. Edwards also states that, throughout 2021, "a consensus of the leading scientific research showed that vaccination was both safe and the most effective way to prevent infection and spread of, and severe illness from, COVID-19." *Id.* ¶ 27. Defendant considered the science to show that "vaccination was also fundamentally different in nature from other preventative measures (like wearing PPE, socially distancing, and testing), so it provided protections in ways that other measures could not substitute." *Id.* Organizations such as the CDC, CMS, FDA, and WHO "recommended vaccination as the best way to protect against COVID-19" and, "to maximize protection against COVID-19," recommended "a combination of both vaccination and other measures (PPE, social distancing, etc.)." *Id.*

In Defendant's opinion, "had [it] permitted unvaccinated individuals to have in-person contact with patients, it would endanger patients, endanger other employees" and "would violate multiple aspects of [its] public mission and undermine public confidence" in it. *Id.* ¶ 32.

### ii. Declaration of Dr. Marcel Curlin

Dr. Marcel Curlin served as the Medical Director of Occupational Health for Defendant in 2021. Curlin Decl., ECF 58 ¶ 2. At that time, Occupation Health served Defendant by "perform[ing] a 'programmatic' function by playing a crucial part in orchestrating the strategy

for OHSU's internal response to the pandemic" and "perform[ing] a 'technical' function by tracking the spread of COVID-19 through all of OHSU." *Id.* ¶ 7.

Defendant relied on Dr. Curlin's department "to determine what protective measures were available, most effective, safe, and unlikely to materially inhibit [Defendant's] provision of healthcare." *Id.* ¶ 18. Dr. Curlin's department did so by "follow[ing] the leading scientific research and literature available at the time concerning COVID-19." *Id.* ¶ 19. Before relying on studies or publications, Dr. Curlin and his colleagues reviewed them for what he refers to as "indicia of validity and reliability." *Id.* ¶ 19. His department determined that publications issued by "reputable public organizations," such as the CDC, FDA, and WHO, "tended to consistently represent the most reliable scientific research available on matters relating to COVID-19," and his department "deferred to these organizations' guidance and made recommendations consistent with that guidance." *Id.* ¶ 20.

As for non-vaccination recommendations, Dr. Curlin's department recommended protective measures including universal masking, additional PPE for many patient-facing providers, social distancing where possible, and testing for anyone with symptoms or suspected exposure. *Id.* ¶ 22. "It was costly to implement these policies," but Defendant "nonetheless incurred these costs because [it] believed it was necessary to fulfill [its] unique ethical, professional, moral, and legal responsibilities to Oregonians." *Id.* ¶¶ 23, 25. These policies were "carefully designed to strike the optimal balance between maximizing protection against COVID-19 while maximizing the quality of healthcare [Defendant] could provide to patients." *Id.* ¶ 27.

Dr. Curlin's department helped design Defendant's COVID-19 vaccination Policy, which required all personnel to become fully vaccinated by October 18, 2021, unless an individual had

an approved medical or religious exemption, and the policy also provided that no unvaccinated employee would be permitted to engage in direct, in-person patient care. *Id.* ¶ 28.

According to Dr. Curlin, his department's "opinions in 2021," which "were based on reliable and valid scientific data that was available at the time," were that "vaccination was the most effective measure of protection against COVID-19," "unvaccinated individuals presented materially higher risks than vaccinated individuals of transmitting COVID-19 to patients," and "unvaccinated individuals faced an increased risk, as compared to vaccinated individuals, of contracting COVID-19 and developing severe or critical COVID-19." *Id.* ¶¶ 28–30. Dr. Curlin also explains that COVID-19 "spread easily within hospitals, putting both patients and healthcare workers at higher risk of contracting COVID-19," and that Defendant "was uniquely at risk of contributing to COVID-19 spread in the community." *Id.* ¶ 15. At the same time, Defendant's "capacity and resources were already under severe stress due to the enormous strain placed on all health systems in [its] region during the pandemic by multiple factors including worker attrition due to illness, and concurrent exceptionally high hospital patient census rates, making it difficult to provide continuously accessible and exemplary healthcare." *Id.* Dr. Curlin attests that his department "knew of no effective measures of protection that could adequately substitute for vaccination, making vaccination an indispensable protective measure." *Id.* ¶ 29.

As Dr. Curlin explains, Defendant's own data for patient hospitalizations supported his department's opinions about the need for vaccination of patient-facing employees. "[T]hroughout late 2021, OHSU tracked patient hospitalizations due [to] COVID-19 and noted that the number of unvaccinated patients hospitalized for COVID-19 at OHSU consistently dwarfed the number of vaccinated patients hospitalized for COVID-19." *Id.* ¶ 34. His department

"concluded from these data that mandatory vaccination at OHSU was vital to protect both patients and employees from COVID-19." *Id.* ¶ 35.

### iii.  Declaration of Nurse Molly Blaser

Nurse Molly Blaser works as the Director of Nursing Services at Defendant's Center for Women's Health, which involves managing the Doernbecher Children's Hospital's MBU, and she worked in the MBU as a registered nurse and nurse manager from February 2003 through May 2021. Blaser Decl., ECF 59 ¶ 2.

The MBU serves new mothers and their newborns, as well as some patients suffering from certain cancers or recovering from gender reassignment surgery. *Id.* ¶¶ 7–8. Some adult patients are immunocompromised, and the MBU treats all newborns as immunocompromised. *Id.* ¶ 9. In 2020 and 2021, "the CDC advised [that] immunocompromised patients we[re] at considerably higher risk of developing severe or critical COVID-19" and that "pregnant people and recently pregnant people are at an increased risk for severe illness from COVID-19 when compared to non-pregnant people." *Id.* ¶¶ 10, 12. Newborns "are not, and cannot be, vaccinated against COVID-19." *Id.* ¶ 11.

According to Nurse Blaser, requiring individuals to maintain a six-foot distance between them in most areas of the MBU is "virtually impossible." *Id.* ¶ 6. This is particularly true for the MBU nurses, who provide direct care to parents and newborns, including "feeding, bathing, clothing, diapering, and administering medication to newborns." *Id.* ¶¶ 13–14. Nurses also must respond to emergencies with mothers, such as post-partum hemorrhages and cardiac emergencies, *id.* ¶¶ 15–16, as well as emergencies with newborns, such as "respiratory emergencies" requiring infant cardiopulmonary resuscitation, *id.* ¶ 17. In other words, emergencies that arise in the MBU often require responses that involve direct physical contact

with the patients. Indeed, according to Nurse Blaser, Plaintiff's work as a registered nurse in the MBU required her to "perform[] direct care to both adult patients and newborns, including providing direct physical care to mothers and feeding, bathing, clothing, diapering, and administering medication to newborns." *Id.* ¶ 22.

Nurse Blaser also explains that "[p]roviding care in the MBU requires special training and experience," meaning "MBU nurses can be difficult to hire, replace, and substitute because only so many nurses have such training and experience that makes them capable of filling these roles." *Id.* ¶ 18. Plaintiff MacDonald was one of only a handful of nurses who possessed the skill and experience to provide care to "special patients who presented with relatively complex medical issues." *Id.* ¶ 23.

Nurse Blaser goes on to describe the special challenges the MBU faced during the COVID-19 pandemic, particularly during the Delta surge throughout mid- and late 2021. While nurses had access to PPE, "the MBU's PPE inventory was perpetually low, as PPE was globally in high demand." *Id.* ¶¶ 19–20. "In mid and late 2021, [the MBU was] surprised by the high number of adult patients who arrived at the MBU and tested positive for COVID-19 on entry," and the MBU "had to assume, out of precaution, that the newborn was positive for COVID-19." *Id.* ¶¶ 27–28. The MBU "could not realistically control who" visited the MBU, and there were difficulties in staffing as nurses were required to follow stay-at-home procedures if they were sick or exposed to the virus. *Id.* ¶¶ 30–31.

Ultimately, "[g]iven the high risks of being in the MBU during the COVID-19 pandemic," the MBU employed all available measures to protect nurses and patients from COVID-19, including vaccination against COVID-19. *Id.* ¶ 34.

#### iv. Expert Report of Dr. Seth Cohen

Defendant provides an expert report from Dr. Seth Cohen, who has worked for "nearly 15 years in epidemiology, internal medicine, and infectious disease" and whose "experience and expertise are focused on the science, spread, mitigation, and treatment of infectious diseases, including . . . COVID-19." Cohen Rep., ECF 61-1 ¶ 1.

Dr. Cohen states that, "[i]n [his] opinion informed by scientific consensus and experience caring for patients with COVID-19, COVID-19 presented a threat to patients and healthcare workers in an[d] around summer and fall 2021. Because of this threat, mandatory COVID-19 vaccination policies were absolutely critical to protecting employees and patients at healthcare facilities." *Id.* ¶ 38. Dr. Cohen adds that "because vaccination was fundamentally different from other protective measures in how it protected individuals from COVID-19, and because no single measure was 100% effective on its own in protecting individuals from COVID-19, it was [his] medical opinion in and around summer and fall 2021 that healthcare organizations should require both vaccination and non-vaccination measures to most effectively mitigate the risks presented by COVID-19." *Id.*

#### b. Defendant's Evidence Establishes that Accommodating Plaintiff Posed an Undue Hardship

Defendant has established that accommodating Plaintiff—either by allowing her to continue working in the MBU while unvaccinated or by removing her from the MBU altogether—would have undermined Defendant's legitimate mission, creating a substantial increased cost and, hence, an undue hardship.

As Defendant points out, it "is legislatively created and charged with a public mission to 'serve the people of the State of Oregon' and 'strive for excellence in education, research, clinical practice, scholarship and community service while maintaining compassion, personal

PAGE 21 – OPINION AND ORDER GRANTING DEFENDANT OHSU'S MOTION FOR SUMMARY JUDGMENT

and institutional integrity and leadership in carrying out its missions.'" MSJ, ECF 55 at 3.

"[K]eep[ing] the community safe" during the COVID-19 pandemic was critical to that mission.

*Id.* at 6.

Before the COVID-19 vaccine became available, Defendant implemented "costly"

policies aimed at protecting against COVID-19. *Id.* at 9–10. "Many patient-facing providers"

were required to wear masks and additional PPE, provided by Defendant even when nationwide

supplies ran short. *See id.* at 9. Defendant required social distancing when possible and testing

for those with symptoms or suspected exposure to the virus. *Id.* at 9–10. Then, when the vaccine

became available in 2021, Defendant determined that, based on "a consensus of consistent and

reliable data," in order to "maximize protection against COVID-19, individuals should use a

combination of *both* vaccination *and* other measures." *Id.* at 11. Indeed, as Defendant explains,

even after receiving the vaccine, the MBU nurses were continuing to wear masks, stay home if

sick, and wear additional PPE when working with patients who had tested positive for COVID-

19. *Id.* at 27 n.8. The combination of protective measures was considered critical to protecting

patients, staff, and the public, consistent with Defendant's mission.

Based on the information and evidence available to it at the time, Defendant concluded

that allowing an unvaccinated nurse to continue serving patients in the MBU posed a substantial

increased cost. Guidelines from the CDC, FDA, and WHO, which Defendant reasonably

concluded bore indicia of validity and reliability, combined with its own internal data analysis,

led Defendant to conclude that an unvaccinated nurse in the MBU would put other staff members

and a vulnerable patient population at risk. And allowing staff and patients to be put at risk

compromised Defendant's mission to serve the community and keep it safe. Thus, allowing

Plaintiff to continue as a nurse in the MBU without vaccination would unduly burden

Defendant's mission and, by extension, the conduct of its particular business. *See* MSJ, ECF 55 at 31. Title VII did not require Defendant to incur this substantial cost. *Bushra v. Main Line Health, Inc.*, CIVIL ACTION NO. 23-1090, 2023 WL 9005584, at *8 (E.D. Pa. Dec. 28, 2023) (concluding on summary judgment that a healthcare facility "would have incurred undue hardship in the form of substantial social, if not economic, costs if it had been required to accommodate" an emergency room physician's COVID-19 exemption request); *Antredu v. Mass. Dep't of Youth Servs.*, CIVIL ACTION No. 22-12016-WGY, 2024 WL 1539725, at *5 (D. Mass. Apr. 9, 2024) (concluding on summary judgment that the plaintiff, a juvenile justice youth development specialist, "would put his colleagues, clients, and their families at a higher risk for contracting COVID-19" and that his employer "may have also lost the confidence of some clients were they to learn that" plaintiff was working with youth while unvaccinated, which would have substantially burdened the employer); *Bordeaux*, 2023 WL 8108655, at *13 (concluding on summary judgment that an employer faced an undue hardship because "[a]ccommodating Plaintiff's [COVID-19 vaccine] exemption request would have put the lives of her fellow cast and crew members in danger" and replacing coworkers who became seriously ill would have been expensive and time-consuming).

Defendant has also shown that removing Plaintiff from the MBU altogether would have presented an undue hardship. *See* MSJ, ECF 55 at 32–34. It would have been required to continue employing Plaintiff while relying on other vaccinated MBU nurses to cover Plaintiff's work, or it would have needed to hire a replacement nurse and pay that nurse's wages on top of Plaintiff's wages. *See id.* at 33. Defendant has established that accommodation for Plaintiff would have resulted in a substantial increased economic cost. Likewise, "any accommodation that involved removing Plaintiff from the MBU would have shifted Plaintiff's hazardous duties

to her coworkers," *see id.* at 34, which posed a substantial non-economic cost to Defendant's business. Defendant has shown that accommodating Plaintiff by removing her from the MBU posed an undue hardship to Defendant.

### c.   Plaintiff Fails to Rebut Defendant's Evidence

As discussed above, much of Plaintiff's evidence is inadmissible and cannot be considered for resolving this Motion. The remainder of Plaintiff's evidence fails to raise a genuine dispute of material fact as to Defendant's undue hardship determination. *See Isaac v. Exec. Off. of Health & Hum. Servs.*, CIVIL ACTION NO. 22-11745-RGS, 2023 WL 8544987, at *2 (D. Mass. Dec. 11, 2023) (concluding on summary judgment that accommodating the plaintiff's COVID-19 vaccine exemption request would pose an undue hardship to plaintiff's employer where plaintiff "challenge[d] only the underlying assumption that the vaccine protects against infection" but presented no evidence to support that challenge), *appeal dismissed*, No. 23-2065, 2024 WL 3159284 (1st Cir. Feb. 22, 2024).

Plaintiff attaches to her Declaration an FDA news release from December 2020, from which she quotes the statement, "At this time, data are not available to determine how long the vaccine will provide protection, nor is there evidence that the vaccine prevents transmission of SARS-CoV-2 from person to person." MacDonald Decl., ECF 66 ¶ 17. Setting aside issues of authentication and hearsay, this news release does not bear on the question at issue in this Motion. The news release relates to the FDA's emergency use authorization of the vaccine in late 2020, *id.*, Ex. D, which predates Defendant's Policy by nine months. As Defendant's evidence shows, information about COVID-19 and the vaccine evolved, and this news release from 2020 does not raise a genuine question about Defendant's undue hardship determination in the fall of 2021.

PAGE 24 – OPINION AND ORDER GRANTING DEFENDANT OHSU'S MOTION FOR SUMMARY JUDGMENT

Plaintiff attaches to her Declaration as Exhibit A "a true and accurate copy of OHSU's financial statements for the fiscal year ending on June 30, 2022." MacDonald Decl., ECF 66 ¶ 13. Setting aside issues of authenticity and foundation, this Exhibit does not raise a genuine issue of material fact here. Plaintiff argues that these financial statements prove that Defendant could have accommodated her without incurring any undue cost, because Defendant had sufficient funding for PPE and additional staffing. *See id.* ¶ 14. As discussed above, both economic and non-economic costs may pose an undue hardship to an employer. Here, even if Plaintiff could show that Defendant did not face a substantial economic cost, that does not preclude summary judgment given Defendant's arguments regarding the non-economic costs it would have faced.

Plaintiff attaches two exhibits, Exhibits J and K, which establish that a different employer, Providence Portland Medical Center ("Providence"), granted her religious exemption request to its COVID-19 vaccine requirement. *See Id.* ¶¶ 29–35. Plaintiff states in her Declaration that Defendant and Providence share similar adult bed capacities and serve the greater Portland metro area. *Id.* ¶ 35. According to the exhibits, Plaintiff submitted her religious exemption request on June 7, 2022, *id.*, Ex. J, and it was granted the following week, *id.*, Ex. K. On her exemption request, Plaintiff lists her role as an "RN Case Manager."[3] Plaintiff does not establish how her role as an RN Case Manager compares to her role as a patient-facing neonatal nurse for Defendant. Regardless, the decisions of a different employer, made at a different time, and with respect to a different position do not raise an issue of fact for Defendant's undue hardship determination for Plaintiff as an MBU nurse in the fall of 2021.

---

[3] The copy of Exhibit J attached to Plaintiff's Declaration is largely illegible. Plaintiff provided a legible copy to the Court and Defendant following oral argument.

Plaintiff attaches two job postings from Defendant, one for a nurse in the MBU and one for a registered nurse case manager. *Id.*, Ex. L. Plaintiff states that the latter is approved for a telecommute work location, which proves that Defendant could have accommodated her request in 2021. *See id.* ¶ 36. Plaintiff does not affirmatively provide the posting dates for these positions, though she states that Defendant "is currently hiring nurses." *Id.* Again setting aside potential admissibility issues with this exhibit, it fails to create a genuine dispute of fact. Only Defendant's hiring practices at the time it made its decision regarding Plaintiff's employment— in the fall of 2021—may be relevant for this Motion. Undated job openings, which appear to have been posted by Defendant in 2024, do not create a genuine issue of material fact here.

Plaintiff's remaining evidence, provided in the body of her Response to Defendant's Motion, likewise does not raise a genuine issue of material fact requiring a trial on Defendant's undue hardship defense. *See* Pl.'s Resp., ECF 65 at 13–18.

Plaintiff cites a media statement from July 2021 made by then-CDC Director Rochelle P. Walensky. Pl.'s Resp., ECF 65 at 15. Setting to the side issues of authentication, and assuming that Plaintiff offers this media statement for a non-hearsay purpose, this statement still does not create a genuine dispute of fact. The statement advised that some data "demonstrat[e] that Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus."[4] As Defendant explains, Defendant was not focused solely on whether vaccination reduced the risk of

---

[4] The hyperlink provided by Plaintiff redirects to an archived version of this media release. Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR, https://archive.cdc.gov/www_cdc_gov/media/releases/2021/s0730-mmwr-covid-19.html (last accessed July 5, 2024).

PAGE 26 – OPINION AND ORDER GRANTING DEFENDANT OHSU'S MOTION FOR SUMMARY JUDGMENT

transmission—it was also concerned with potential reduction in severe or critical COVID-19 and reduction in reinfection. *See* MSJ, ECF 55 at 12. Even construing the evidence in Plaintiff's favor and resolving reasonable inferences in her favor, this statement does not create a triable issue here. Defendant's evidence still establishes that, based on the information available, it reasonably concluded that the COVID-19 vaccine was a necessary measure for patient-facing staff members like Plaintiff.

Last, Plaintiff cites a report provided by BioNTech to the U.S. Securities and Exchange Commission in March 2022. Pl.'s Resp., ECF 65 at 15. She states that in this report BioNTech "admitted it lacked proof of its vaccine's safety or efficacy." *Id.* As discussed above, Plaintiff failed to provide a pin cite or a quotation to assist this Court in confirming that this 700-page report stands for what she claims it does, and it is not this Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan*, 91 F.3d at 1279. Regardless, assuming this report supports Plaintiff's proposition, it still does not create a genuine issue of fact. Statements made by a vaccine manufacturer in March 2022 do not create a triable issue of fact about what Defendant understood in the fall and summer of 2021.

This Court also notes that Plaintiff chose not to depose Defendant's expert witness, and that she did not provide an expert witness in rebuttal. At oral argument, Plaintiff suggested that she should be able to develop a genuine issue of material fact through cross-examination of Defendant's expert witness at trial. "A plaintiff's desire to cross-examine a witness does not provide a basis upon which to deny summary judgment." *Stiles v. Walmart, Inc.*, 639 F. Supp. 3d 1029, 1058 (E.D. Cal. 2022) (citing *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983)), *reconsideration denied*, No. 2:14-cv-02234-DAD-DMC, 2023 WL 1110438 (E.D. Cal. Jan. 30, 2023). At this stage, to rebut the opinions of Defendant's expert witness,

Plaintiff must offer more than "an unspecified hope of undermining his . . . credibility" and questioning his conclusions. *Nat'l Union Fire Ins. Co.*, 701 F.2d at 97. Plaintiff has not done so.

## CONCLUSION

At bottom, Plaintiff attempts to litigate the efficacy of the COVID-19 vaccine, but Defendant's affirmative defense of undue hardship rises and falls not on the efficacy of the vaccine, but on Defendant's assessment of undue hardship at the time it denied Plaintiff's exemption and terminated Plaintiff for refusing to get the COVID-19 vaccine in 2021. That is, that an MBU nurse's failure to vaccinate amounted to a substantial non-economic and economic cost to the conduct of its particular business. And here, the conduct of Defendant's particular business includes its mission to protect the health and safety of its patients and its staff. As Defendant's representatives and expert witness have attested, the evidence available to Defendant in 2021 established that patient-facing healthcare providers must receive the vaccine for myriad reasons: mitigating the spread of COVID-19; reducing the risk of developing severe or critical COVID-19; shortening the recovery time for breakthrough infections; and lowering the risk of reinfection. Given that evidence, which is unrebutted by Plaintiff here, Defendant has established that accommodating Plaintiff's religious beliefs would have posed an undue hardship. Defendant OHSU's Motion for Summary Judgment, ECF 55, is GRANTED.

**IT IS SO ORDERED.**

DATED this 5th day of July, 2024.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 28 – OPINION AND ORDER GRANTING DEFENDANT OHSU'S MOTION FOR SUMMARY JUDGMENT